# EXHIBIT 1

# SCHONBRUN SEPLOW HARRIS
# HOFFMAN & ZELDES LLP

9415 Culver Blvd. #115
Culver City, CA 90232
(310) 396-0731  (310) 399-7040 (fax)
www.sshhzlaw.com

Michael D. Seplow
Wilmer J. Harris
Paul L. Hoffman
Helen I. Zeldes
Aidan C. McGlaze
John C. Washington
Kristina A. Harootun
Ben Travis
Sarah L. Dawley
Ben Graubart

Of Counsel
Benjamin Schonbrun
Catherine E. Sweetser
*Erwin Chemerinsky*
*Illinois and Dist. Columbia

South Pasadena Office
715 Fremont Avenue
Suite A
South Pasadena, CA 91030
(626) 441-4129
(626) 283-5770 (fax)

Hermosa Beach Office
200 Pier Ave, #226
Hermosa Beach, CA 90254

San Diego Office
501 W. Broadway
Suite 800
San Diego, CA 92101
(619) 400-4990

November 22, 2021

**VIA EMAIL AND FEDERAL EXPRESS OVERNIGHT**
Stacey Friedman
Executive Vice President and General Counsel. for J.P. Morgan Chase
383 Madison Avenue
New York, NY 10179
Email: stacey.friedman@jpmorgan.com

RE:  **RULE 1782 REQUEST FOR DOCUMENTATION HELD BY JP MORGAN
CHASE TO ASSIST FOREIGN LITIGATION**

We represent Olanrewaju Suraju, Chair of Human and Environmental Development
Agenda (HEDA Resources Centre), a prominent Nigerian anti-corruption non-governmental
organisation.

Our client is currently suing Mr. Mohamed Bello Adoke SAN, the former Attorney
General of Nigeria, in the High Court of the Federal Capital Territory, Abuja, Nigeria, for
defamation. Mr Suraju's application to the court is attached.

Mr Adoke has accused our client of forging an email sent by a "Mohammed Bello
Adoke" to Bayo Osolake, an employee of JP Morgan Chase, on 21 June 2011. The email was
sent from agroupproperties@yahoo.com, an email address belonging to Mr. Aliyu Abubakar, a
Nigerian business entrepreneur who is on trial in Nigeria for money laundering and other
offences associated with the sale of the OPL 245 oil field to Shell and Eni, a transaction for
which JP Morgan Chase acted as the escrow agent. Mr Adoke is also on trial for related offences.
Mr Adoke's allegation is palpably absurd. The email was disclosed by JP Morgan Chase in
proceedings in the London High Court between JP Morgan Chase and the Federal Republic of
Nigeria (case no: CL-2017-000730). Subsequently, it was obtained by the Milan Magistrate
through a Mutual Legal Assistance Request to the United Kingdom. The email was sought by the
Italian authorities as evidence in the prosecution of Shell, Eni and others for international
corruption related to the OPL 245 deal. The email was entered into the Milan case file and is a
public document, as is the MLA. The companies and other defendants were acquitted in March.
The acquittal is being appealed.

November 22, 2021
Page 2

Following Mr. Adoke's allegations, the Nigerian police has also filed criminal charges against our client, and the arraignment is scheduled for November 23, 2021. A copy of the indictment is attached, as is the copy of the email produced in Italy.

Although our client has a copy of the email as forwarded by Mr. Osolake, the routing information, including the IP address of the sender of the original email ("agroupproperties@yahoo.com") has not been made public.  In addition, we are seeking related emails and information which would tend to show that emails were regularly sent from the account used in this email to JP Morgan.

Our client is therefore seeking the following information from JP Morgan:

- A true, correct, and complete copy of the email received by Bayo Osolake through the email address bayo.o.osolake@jpmorgan.com from agroupproperties@yahoo.com, entitled "bloc 245 malabu resolution agreement" on 21 June 2011, including any and all attachments.

- Any and all correspondence, whether email or otherwise, between any employees of J.P. Morgan, including but not limited to Bayo Osolake, and agroupproperties@yahoo.com or the company A Group Properties.

- Any and all metadata, attachments, tracking information, or any other attached data for the above documents.

- The routing information for the email received by Bayo Osolake through the email address bayo.o.osolake@jpmorgan.com from agroupproperties@yahoo.com, entitled "bloc 245 malabu resolution agreement" on 21 June 2011.

- The IP address of the sender.

As you will be aware, our client has the right to seek this disclosure through the courts, pursuant to the provisions of 28 U.S.C. Section 1782.  However, our client is hopeful that court action can be avoided and is therefore seeking JP Morgan Chase's co-operation in this matter.

Sincerely,
**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES LLP**
*Paul Hoffman*
*Catherine Sweetser*
*John Washington*

---

cc: CT Corporation System, Agent of
Service of Process for J.P. Morgan Chase
330 North Brand Blvd., Suite 700
Glendale, California 91203
*Sent Via Federal Express*
*Overnight Only*

*Barrister Adekunle Adegoke (SAN)*
Principal Counsel
Kunle Adegoke & Co
1, Abiodun Famodimu Street,
Off Esugbayi Street,
GRA, Ikeja, Lagos,
Nigeria
info@kunleadegokeandco.com
*Sent Via Email Only*

# ATTACHMENT 1

| From: | Osolake, Bayo O <bayo.o.osolake@jpmorgan.com> |
|---|---|
| Sent: | Tuesday, June 21, 2011 12:24 PM |
| To: | Adewuyi, Tosin T <tosin.t.adewuyi@jpmorgan.com> |
| Subject: | FW: block 245 malabu resolution agreement |
| Attach: | MALABU2_1706.pdf; MALABU3_1706.pdf; MALABU4_1706.pdf; scanMALABU 10001.pdf |

FYI


-----Original Message-----
From: A Group Properties [mailto:agroupproperties@yahoo.com]
Sent: 21 June 2011 11:47 AM
To: Osolake, Bayo O
Subject: block 245 malabu resolution agreement

Dear Sir,

Kind find attached document for your information and action, if necessary.

Mohammed Bello Adoke

JPMC2_202012_000001



THIS AGREEMENT ("FGN Resolution Agreemen

BLOCK 245 RE

Between

THE FEDERAL GOVERNMENT OF NIGERIA (hereii
Honourable Attorney General of the Federation and Minist
urces and the Minister of Finance; and

IGERIA ULTRA-DEEP LIMITED, a company incorporat
Nigeria having its registered office at Freeman house, 21/
NUD, which expression where the context so admits shall incl.

VAL PETROLEUM CORPORATION, a statutory corporat.
ral Republic of Nigeria whose Head Office is at NNPC Tower
B 190, Garki, Abuja, Nigeria (hereinafter referred to as 'NNP(
o admits shall include its successors-in-title and assigns), and

ON LIMITED a company established under the laws of the i
ffice is at Churchgate Building, Plot 473 AO Constitution Ave
r referred to as 'NAE', which expression where the context.
'd assigns), and

PRODUCTION COMPANY LIMITED, a company
lic of Nigeria having its registered office at Freeman
SNEPCO, which expression where the context so

ed to herein individually as a ''



**BLOCK 245 RE**

**THIS AGREEMENT** ("FGN Resolution Agreemen.

Between

**THE FEDERAL GOVERNMENT OF NIGERIA** (hereii
. Honourable Attorney General of the Federation and Minist
urces and the Minister of Finance; and

**'IGERIA ULTRA-DEEP LIMITED**, a company incorporat
Nigeria having its registered office at Freeman house, 21/-
'NUD, which expression where the context so admits shall incl.

**VAL PETROLEUM CORPORATION**, a statutory corporat.
'ral Republic of Nigeria whose Head Office is at NNPC Towers.
'B 190, Garki, Abuja, Nigeria (hereinafter referred to as '**NNP**'
'o admits shall include its successors-in-title and assigns), and

**'ON LIMITED** a company established under the laws of the .
'ffice is at Churchgate Building, Plot 473, AO Constitution Av.
'r referred to as "**NAE**", which expression where the context .
'd assigns), and

**'PRODUCTION COMPANY LIMITED**, a company'
lic of Nigeria having its registered office at Freeman
'. **SNEPCO**, which expression where the context so

'ed to herein individually as a P

CONFIDENTIAL

WHEREAS:

A. On the 29th of April 1998, FGN granted an Oil Prospecting License (OPL 245) over oil block 245 ("Block 245") to Malabu Oil & and Gas Limited company incorporated under the laws of the Federal Republic of Nigeria ("MALABU").

B. On 30th March, 2001, MALABU and SNUD entered into a Farm-in Agreement, and a Deed of Assignment under which MALABU assigned forty (40) percent equity interest in OPL 245 to SNUD.

C. On the 2nd July 2001, FGN revoked OPL 245.

D. By a letter dated the 23rd May 2002, the then Honourable Minister of Petroleum Resources, on behalf of FGN awarded Block 245 to SNUD on the basis of a Production Sharing Contract ("PSC"), following a competitive bid with another international oil company, on the invitation of the FGN.

E. On 22nd December 2003, NNPC executed a PSC with SNUD, (hereinafter referred to as the "2003 PSC"), granting SNUD the right to exclusively operate Block 245 as contractor for a term of thirty (30) years.

F. Subsequent to the revocation referred to in paragraph C above and the execution of the 2003 PSC, various law suits involving the FGN, NNPC, MALABU and SNUD, were instituted to determine disputes arising from the revocation of OPL 245 by the FGN, the termination of the agreements between MALABU and SNUD referred to in paragraph B above, and the execution of the 2003 PSC in respect thereof, with SNUD.

G. On 30th November, 2006, the FGN executed a settlement agreement with MALABU wherein the FGN, without admission of liability for any alleged wrongful, unlawful, unjust or any like conduct, agreed to re-allocate Block 245 to MALABU in consideration of MALABU discharging and releasing the FGN from all claims and suits filed by MALABU against the FGN in connection with the revocation of MALABU's interest on 2nd July 2001.

H. As a result of the execution of the settlement agreement referred to in paragraph G above, a number of dispute resolution proceedings were initiated by SNUD against the FGN including the Bilateral Investment Treaty (BIT) arbitration No. ARB/07/18 pending at the International Centre for the Settlement of Investment Disputes ("ICSID Arbitration"), to enforce SNUD's rights to exclusively operate Block 245 as Contactor on the basis of the 2003 PSC between NNPC and SNUD.

I. The extant cases of those referred to in paragraphs F and H above, are:

Execution version

i.    CA/A/25M/2003 - SNUD vs. The House of Representatives and MALABU.

ii.   **ICC No. 12136 MS (C12137/MS)** SNUD vs. MALABU. (Arbitration with resulting award in favor of SNUD delivered on 20ᵗʰ December 2004, and    costs of US$2.735 million awarded against MALABU.)

iii.  **FHC/NRJ/01/2009** - SNUD vs. MALABU, by which the ICC Award was registered on 29 March, 2010, making it enforceable in Nigeria.)

iv.   **ICSID Case No. ARB/07/18**- Bilateral Investment Treaty arbitration between SNUD and the FGN. (Ruling pending.)

J.  On 2ⁿᵈ July 2010, FGN again issued a letter to MALABU, re-allocating Block 245 to MALABU.

K.  FGN is willing to settle all claims to any interest in OPL 245 by SNUD against FGN and/or MALABU in the terms of this Agreement.

L.  Pursuant to paragraph K above, FGN has entered into agreements of even date, respectively with MALABU and SNUD (The 'Resolution Agreements'), in respect of the resolution referred to in paragraph K above, by which, MALABU has relinquished all claims to OPL 245 and agrees to all future actions which FGN may take under this FGN Resolution Agreement with respect to OPL 245.

M.  SNUD agrees to the reallocation of its interest in Block 245 to SNEPCO, an Affiliate of SNUD, and SNEPCO agrees to reimburse the past costs and the signature bonus paid by SNUD in respect of Block 245 as well as to agree terms with NAE to jointly undertake the future development of the Block 245.

N.  FGN and SNUD now wish to resolve their differences amicably with respect to Block 245 and to set out the agreed interests of the Parties with respect to Block 245 in accordance with the terms of this FGN Resolution Agreement.

**NOW THEREFORE,** pursuant to FGN's confirmation of the full and final resolution with MALABU and SNUD, of all MALABU's and SNUD's respective claims and issues in dispute over Block 245 and a mutual reciprocal release from all claims, under the Resolution Agreements, FGN, SNUD, NNPC, SNEPCO and NAE **HAVE AGREED** in the manner hereinafter stated:

1

1.1  SNEPCO shall reimburse SNUD in respect of: (i) costs incurred by SNUD under Clause 2(i); and (ii) costs of three hundred thirty five million and six hundred thousand US Dollars ($335,600,000) incurred by SNUD related to the execution of the work-programme pursuant to

Execution version

JPMC2_202012_000005

the terms of the 2003 PSC and in consideration of this payment SNUD hereby consents to the reallocation of the interests in Block 245 by the FGN as agreed in Clause 1.2 herein.

1.2   The FGN hereby causes the allocation of Block 245 and will cause the grant of the relevant Oil Prospecting license by the Minister of Petroleum Resources in favour of SNEPCO and NAE as joint licence holders under the Petroleum Act Cap P10, Laws of the Federation of Nigeria, 2004 on the terms of this FGN Resolution Agreement.

1.3   Following the execution of this FGN Resolution Agreement, (i) SNUD shall, on behalf of SNEPCO and NAE pay to the FGN the Signature Bonus in accordance with Clause 2 below, and FGN hereby agrees that not later than seven (7) days thereafter FGN shall grant the Oil Prospecting license in respect of Block 245 to SNEPCO and NAE and (ii) NAE shall, on behalf of NAE and SNEPCO and FGN, appoint an escrow agent for the purpose of paying to FGN a sum equal to one billion ninety two million and forty thousand Dollars (US$1,092,040,000) for the purposes of FGN settling all and any existing claims and/or issues over Block 245, in accordance with Clause 3 below.

1.4   Upon the grant of the Oil Prospecting License to SNEPCO and NAE pursuant to Clause 1.2 hereof, NNPC and SNUD agree that the 2003 PSC is terminated as of the date of grant of the Oil Prospecting License to SNEPCO and NAE. Consequent upon the termination of the 2003 PSC, NNPC and SNUD release and discharge each other fully and effectively from all and any existing and continuing obligations that would otherwise survive the termination of the 2003 PSC except that this release shall not be deemed to extend to any claim or obligations related thereto and arising from this FGN Resolution Agreement.

1.5   The FGN confirms that the Oil Prospecting License to be granted to SNEPCO and NAE shall be for an aggregate period of ten (10) years commencing from the date it is issued, and any OMLs which may derive therefrom shall have a duration of twenty (20) years plus additional renewals as allowed by law.

2   Upon the execution of this FGN Resolution Agreement by all the Parties herein:

i)   FGN and SNUD as parties to an escrow agreement dated 22nd December 2003 ("the Escrow Agreement") shall issue to the Escrow Agent, (JP Morgan Chase Bank) a notice (in the form attached to this FGN Resolution Agreement as Schedule 1) as required under Clause 10.1 of the Escrow Agreement, terminating the Escrow Agreement with an instruction to pay the sum of two hundred and seven million nine hundred sixty thousand US Dollars ($207,960,000.00) representing the Signature Bonus, into the FGN Receiving Account. The balance of the Escrow Fund shall be paid into the Shell Receiving Account free of any taxes. The Parties acknowledge and agree that the payment of the Signature Bonus made pursuant to this Clause 2(i), represents the full payment of the Signature Bonus for the acquisition by SNEPCO and NAE of all rights over Block 245 and that no other payments are or will be due by any of SNUD, SNEPCO and NAE to FGN in this respect other than as provided for in Clause 3.

ii)   FGN and NAE shall enter into an escrow agreement ("Escrow Agreement no. 2"), substantially in the form attached to this FGN Resolution Agreement as Schedule 2, with a bank of international standing acceptable to such Parties within five (5) Business Days from the Execution Date.

Execution version

For the purposes of Clause 2(i) above, "Escrow Agent", "Escrow Fund", "FGN Receiving Account" and "Shell Receiving Account" shall have the meaning ascribed to them in the Escrow Agreement.

3    Within five (5) Business Days of the grant and delivery to SNEPCO and NAE by FGN of the Oil Prospecting license for Block 245 duly issued jointly in the name of SNEPCO and NAE pursuant to Clause 1.2 above NAE shall, on behalf of both NAE and SNEPCO, wire transfer to the account opened in accordance with the Escrow Agreement no. 2 the amount of one billion ninety two million and forty thousand Dollars (US$1,092,040,000) to the benefit of FGN pursuant to Clause 1.3.

Subject to receipt by NAE and SNEPCO of a letter from FGN confirming that it has achieved the full and final resolution of all claims and issues in dispute over Block 245 and obtained a release from all claims on Block 245 from the relevant parties, NAE and SNEPCO as parties to the Escrow Agreement No.2 shall issue to the escrow agent, a notice (in the form attached to the Escrow Agreement No.2) terminating the Escrow Agreement No. 2 with an instruction to pay the sum indicated in this Clause 3 into the FGN Escrow Account as defined in the Escrow Agreement No.2.

4    The rights and obligations of NAE and SNEPCO as between themselves in the operations of Block 245 shall be governed by a Production Sharing Agreement (PSA) to be executed between themselves or between themselves and/or their nominees.

5    The PSA shall be treated as and deemed a "Production Sharing Contract" as defined in section 17 of the Deep Offshore and Inland Basin Production Sharing Contracts Act, Cap D3, Laws of the Federation of Nigeria 2004.

6.    The FGN confirms to NAE and SNEPCO that the fiscal terms as provided in the Deep Offshore and Inland Basin Production Sharing Contracts Act Cap D3, Laws of the Federation of Nigeria, 2004, shall be applicable to the PSA between NAE and SNEPCO with respect to Block 245.

In the event of any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions directives or policies, applying to this FGN Resolution Agreement and/or the Oil Prospecting License for Block 245 and/or subsequent Oil Mining Lease (OML) derived therefrom, including the above fiscal terms, introduced by any Government department or Government parastatals or agencies occurs subsequent to the Execution Date, which materially and adversely affects the rights and obligations or the economic benefits of NAE and SNEPCO, the relevant Parties shall agree to such modifications to this FGN Resolution Agreement and/or any agreements between the relevant Parties in furtherance hereof as will redress and remove the adverse effect of such changes with retroactive effect from the date of such adverse change.

7.    Tax Oil under the PSA shall be allocated, in the proportion of their interests in Block 245, to NAE and SNEPCO, as Holder as defined in the Deep Offshore and Inland Basin Production Sharing Contracts Act. Each of NAE and SNEPCO shall have the right to lift its share of the allocated Tax Oil and remit the proceeds thereof to the appropriate agencies of the FGN for the discharge of their proportionate share of the PPT obligations attributable to the Contract Area.

Execution version

8.  The Parties hereby expressly agree that nothing in this FGN Resolution Agreement shall be taken as an admission by FGN, or any of its agents and authorities, including NNPC, of the possibility that either SNEPCO or NAE acting in their respective capacities as Contractor' (as such term is defined), under existing production sharing contracts with NNPC are engaged in Petroleum Operations, nor can it be cited in any ongoing arbitral proceedings between NAE, SNEPCO and any of the agencies of FGN in respect of such existing production sharing contracts between NAE, SNEPCO and NNPC.

9.  FGN confirms that all sums reimbursed to SNUD by SNEPCO under Clause 1.1(ii) above is expenditures on mineral assets, being the acquisition of petroleum deposits or rights in or over such deposits and information relating to the extent of such deposits, and is incurred wholly, exclusively, necessarily and reasonably for the purposes of petroleum operations in Block 245 and shall be treated accordingly for the purposes of the laws listed in the First Schedule to the Federal Inland Revenue (Establishment) Act 2007, and as such each of NAE and SNEPCO shall be entitled to treat the sums referred to in Clause 1.1(ii) above in accordance with their participating interest in the Block 245 when calculating PPT and pursuant to the PSC Act.

10. FGN hereby grants full and unconditional exemption from any obligations and liabilities in respect of capital gains tax, taxes on income, withholding taxes and Value Added Tax in respect of the transactions and payments mentioned in Clause 1 arising from or relating to this FGN Resolution Agreement. Notwithstanding the foregoing and without prejudice to the position of FGN and NNPC, NAE and SNEPCO shall not be precluded from presenting a claim for any allowances applicable by law on the amount of Signature Bonus to FIRS in the normal course.

11  The Parties enter into this Agreement on the understanding that NAE and SNEPCO and/or their permitted assigns shall be sole and exclusive owners of Block 245 for the duration of the Oil Prospecting Licence and any OML derived therefrom, including any renewals allowed by law. Notwithstanding the foregoing, if at any time FGN and/or its relevant agencies and institutions decides by law to participate or acquire any interest in the Oil Prospecting license or any OML for Block 245 issued pursuant to this FGN Resolution Agreement, the FGN undertakes to NAE and SNEPCO that:

    (i)   the participation of the FGN and/or its relevant agencies and institutions shall be exercised by way of acquiring not more than fifty (50%) percent interest under the Oil Prospecting licence or relevant oil mining lease subject to the payment by FGN to NAE and SNEPCO of the cost of the latters' acquisition of Block 245 which shall be an amount equal to the proportionate share relative to the interest acquired by the FGN and/or its relevant agencies and institutions of the sums paid by NAE and SNEPCO under Clauses 2 and 3 of this FGN Resolution Agreement net of any taxes, levies or other duties whatsoever; plus accrued interest as agreed by the relevant parties; and

    (ii)  the FGN and/or its relevant agencies and institutions shall enter into a production sharing contract with NAE and SNEPCO as Contractors for the exclusive conduct of petroleum Operations in respect of the FGN's acquired interest in the Block 245 ("FGN PSC"); The

Execution version

terms of the FGN PSC shall be no less favourable than the terms previously agreed between NNPC and SNUD in the agreement referenced in Preamble E; and

(iii)   the FGN's and/or its relevant agencies and institutions' proportionate share relative to its acquired interest, of all costs incurred by NAE and SNEPCO in Block 245 from the date of the grant of the Oil Prospecting Licence, pursuant to Clause 1.3, up to the date of the acquisition of interest by FGN and/or its relevant agencies and institutions pursuant to this Clause 11, shall be recoverable by NAE and SNEPCO under the FGN PSC.

12.   FGN confirms that the terms of this FGN Resolution Agreement have been agreed by all the appropriate agencies of the FGN including the Ministry of Finance, and the Federal Inland Revenue Service.

13   FGN acknowledges that, in entering into this FGN Resolution Agreement, the other Parties have relied on its express or implied representation and other assurances made by its agents and representatives before the signature of this FGN Resolution Agreement regarding the efficacy of the terms thereof.

14.   This FGN Resolution Agreement and any agreements executed by the Parties on the date of this FGN Resolution Agreement or in pursuance thereof, supersede all and any agreement or arrangement between the Parties or any of them entered into prior to the date of this FGN Resolution Agreement , either by letter directive, or howsoever relating to Block 245.

15.   No amendments, changes or modifications to this FGN Resolution Agreement shall be valid except if the same are in writing and signed by a duly authorised representative of each of the Parties hereto.

16.   Each of the Parties shall do all such acts and execute and deliver all such documents as shall be reasonably required in order to fully perform and carry out the terms of this FGN Resolution Agreement.

17.   FGN shall indemnify, save and hold harmless, and defend SNUD, SNEPCO and NAE from and against all suits, proceedings, claims, demands, losses and liability of any nature or kind, including, but not limited to, all litigation costs, attorneys' fees, settlement payments, damages, and all other related costs and expenses, based on, arising out of, related to, or in connection with: (i) this FGN Resolution Agreement, (ii) the Resolution Agreements and/or (iii) the issuance of the Oil

Execution version

Prospecting licence in respect of Block 245 jointly in the name of SNEPCO and NAE, and arising out of any asserted prior interest in Block 245.

18. Each Party agrees that they and their employees, agents, agencies, subsidiaries, and attorneys will keep confidential at all times, this Agreement, the terms thereof, and the discussions or negotiations that led to the Agreement, except to the extent required by law or any competent regulatory body.

19 Definitions:

19.1 **"Affiliate"** means: a company which, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with a Party. For this purpose control means the direct or indirect ownership of in aggregate fifty percent (50%) or more of the voting capital.

19.2 **"Business Day"** shall mean a day other than Saturday, Sundays and public holidays, on which banks are open for business in Nigeria

19.3 **"Clause"** means a clause of this Resolution Agreement.

19.4 **"Execution Date"** means the date first written in this Resolution Agreement; being the date on which all Parties to this Resolution Agreement execute this Resolution Agreement.

19.5 **"PSA"** means the production sharing agreement to be entered into between NAE and SNEPCO for the conduct of Petroleum Operations in respect of OPL 245 pursuant to this Agreement.

19.5 **"Signature Bonus"** means the sum referred to in Clause 2(i) of this Resolution Agreement.

**SIGNED AND AGREED** the day and year first above written.

For and on Behalf of the **FEDERAL GOVERNMENT OF NIGERIA**:

..............................................................................................
**THE HON. ATTORNEY GENERAL OF THE FEDERATION
AND MINISTER OF JUSTICE.**

..............................................................................................
**THE HON. MINISTER OF PETROLEUM RESOURCES**

..............................................................................................
**THE HON. MINISTER OF FINANCE**

The **COMMON SEAL** of **NIGERIAN AGIP EXPLORATION LIMITED** was affixed to this Resolution Agreement and was duly delivered in the presence of:

Execution version

.........................................                    .........................................
**VICE CHAIRMAN AND MANAGING DIRECTOR**          **COMPANY SECRETARY**

The **COMMON SEAL** of **SHELL NIGERIA ULTRA-DEEP LIMITED** was affixed to this FGN
Resolution Agreement and was duly delivered in the presence of:

.........................................                    .........................................
**DIRECTOR**                                     **SECRETARY**

The **COMMON SEAL** of **SHELL NIGERIA EXPLORATION AND PRODUCTION
COMPANY LIMITED** was affixed to this FGN Resolution Agreement and was duly delivered in the
presence of:

.........................................                    .........................................
**DIRECTOR**                                     **SECRETARY**

The **COMMON SEAL** of **NIGERIAN NATIONAL PETROLEUM CORPORATION** was affixed
to this FGN Resolution Agreement and was duly delivered in the presence of:

.........................................                    .........................................
**GROUP MANAGING DIRECTOR**                      **COMPANY SECRETARY/LEGAL ADVISER**

Execution version

## BLOCK 245 SNUD RESOLUTION AGREEMENT

**THIS RESOLUTION AGREEMENT** is made this        day of April 2011

**Between**

**THE FEDERAL GOVERNMENT OF NIGERIA** (hereinafter referred to as the **FGN**) represented by Honourable Attorney General of the Federation and the Minister of Petroleum Resources; and

**SHELL NIGERIA ULTRA-DEEP LIMITED**, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as **SNUD**, which expression where the context so admits shall include its successors-in-title and assigns); and

**SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY NIGERIA LIMITED**, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as **SNEPCO**, which expression where the context so admits shall include its successors-in-title and assigns);

**FGN, SNUD and SNEPCO** may also be referred to herein individually as a **"Party"** or, collectively, as the **"Parties"**.

**WHEREAS:**

A.  On the **29th of April 1998,** the FGN granted an Oil Prospecting License (OPL 245) over oil block 245 (**"Block 245"**) to MALABU.

B.  On **30th March, 2001,** MALABU and Shell Nigeria Ultra Deep Limited (**"SNUD"**) entered into a Farm-in Agreement, and a Deed of Assignment under which MALABU assigned forty (40) percent equity interest in OPL 245 to SNUD.

C.  On the **2nd July 2001,** FGN revoked OPL 245.

D.  By a letter dated the **23rd May 2002,** the then Honourable Minister of Petroleum Resources, on behalf of FGN awarded Block 245 to SNUD on the basis of a Production Sharing Contract (**"PSC"**), following a competitive bid with another international oil company, on the invitation of the FGN.

E.  On **22nd December 2003,** Nigerian National Petroleum Corporation (**"NNPC"**) executed a PSC with SNUD, (hereinafter referred to as the **"2003 PSC"**), granting SNUD the right to exclusively operate Block 245 as contractor for a term of thirty (30) years.

1

BLOCK 245 SNUD RESOLUTION AGREEMENT

THIS RESOLUTION AGREEMENT is made this          day of April 2011

Between

THE FEDERAL GOVERNMENT OF NIGERIA (hereinafter referred to as the FGN) represented by Honourable Attorney General of the Federation and the Minister of Petroleum Resources; and

SHELL NIGERIA ULTRA-DEEP LIMITED, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as SNUD, which expression where the context so admits shall include its successors-in-title and assigns); and

SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY NIGERIA LIMITED, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as SNEPCO, which expression where the context so admits shall include its successors-in-title and assigns);

FGN, SNUD and SNEPCO may also be referred to herein individually as a "Party" or, collectively, as the "Parties".

WHEREAS:

A. On the 29th of April 1998, the FGN granted an Oil Prospecting License (OPL 245) over oil block 245 ("Block 245") to MALABU.

B. On 30th March, 2001, MALABU and Shell Nigeria Ultra Deep Limited ("SNUD") entered into a Farm-in Agreement; and a Deed of Assignment under which MALABU assigned forty (40) percent equity interest in OPL 245 to SNUD.

C. On the 2nd July 2001, FGN revoked OPL 245.

D. By a letter dated the 23rd May 2002, the then Honourable Minister of Petroleum Resources, on behalf of FGN awarded Block 245 to SNUD on the basis of a Production Sharing Contract ("PSC"), following a competitive bid with another international oil company, on the invitation of the FGN.

E. On 22nd December 2003, Nigerian National Petroleum Corporation ("NNPC") executed a PSC with SNUD, (hereinafter referred to as the "2003 PSC"), granting SNUD the right to exclusively operate Block 245 as contractor for a term of thirty (30) years.

1

JPMC2_202012_000013

F. Subsequent to the revocation referred to in paragraph C above and the execution of the 2003 PSC, various law suits involving FGN, MALABU and SNUD, were filed to determine disputes arising from the revocation of OPL 245 by the FGN, the termination of the agreements between MALABU and SNUD referred to in paragraph B above, and the execution of the 2003 PSC in respect thereof, with SNUD.

G. On **30th November, 2006**, the FGN executed a settlement agreement with MALABU wherein the FGN, without admission of liability for any alleged wrongful, unlawful, unjust or any like conduct, agreed to re-allocate Block 245 to MALABU in consideration of MALABU discharging and releasing the FGN from all claims and suits filed by MALABU against the FGN in connection with the revocation of MALABU's interest on 2nd July 2001.

H. As a result of the execution of the settlement agreement referred to in paragraph G above, a number of dispute resolution proceedings were initiated by SNUD against FGN and/or MALABU, including the Bilateral Investment Treaty (BIT) arbitration **No. ARB/07/18** pending at the International Centre for the Settlement of Investment Disputes (**"ICSID Arbitration"**), to enforce SNUD's rights to exclusively operate Block 245 as Contactor on the basis of the 2003 PSC between NNPC and SNUD.

I. The cases remaining between FGN, MALABU and SNUD are:

  i. **CA/A/25M/2003** - SNUD vs. The House of Representatives and MALABU.

  ii. **ICC No. 12136 MS (C12137/MS)** SNUD vs. MALABU. (Arbitration with resulting award in favor of SNUD delivered on 20th December 2004, and costs of US$2.735 million awarded against MALABU.)

  iii. **FHC/NRJ/01/2009** - SNUD vs. MALABU, by which the ICC Award was registered on 29 March, 2010, making it enforceable in Nigeria.

  iv. **ICSID Case No. ARB/07/18-** Bilateral Investment Treaty arbitration between SNUD and the FGN. (Ruling pending.)

J. On 2nd July 2010, FGN again issued a letter to MALABU, re-allocating Block 245 to MALABU.

K. FGN has decided to resolve its differences with SNUD amicably with respect to Block 245.

L. Notwithstanding paragraph J above, MALABU is willing to settle and waive any and all claims to any interest in Block 245 in consideration of receiving compensation from the FGN.

M. Further to paragraphs K and L above, FGN has entered into an agreement of even date with MALABU (the **"MALABU Settlement"**) in respect to the matters referred to in paragraphs G, I and J above, by which, MALABU has relinquished all claims to OPL 245 and agrees to all future actions which FGN may take under this Resolution Agreement with respect to Block 245.

N. Pursuant to paragraphs K and L above, and with the full concurrence and agreement of MALABU, FGN is willing to reallocate Block 245 to Nigerian Agip Exploration Limited, (**"NAE"**) and

2

SNEPCO (an Affiliate of SNUD), in accordance with the terms of a reallocation agreement of even date to be entered into between FGN, SNUD, SNEPCO, NAE and NNPC, ("the Reallocation Agreement").

NOW THEREFORE, FGN and SNUD HAVE AGREED as follows with respect to Block 245:

1   All existing, claimed, asserted or disputed rights and privileges of SNUD, including contracts, and arrangements, arising from or pursuant to Block 245 whether such rights and privileges existed, are claimed, asserted or disputed among themselves, or against the whole world (including any party claiming through FGN) shall at the Execution Date, be substituted by the following arrangement:

   1.1   FGN has executed the MALABU Settlement, under which MALABU, (i) has relinquished all claims to OPL 245; and (ii) has agreed to release SNUD from all pending obligations and liabilities arising from any judgment/awards made pursuant to the various cases instituted and/or against SNUD by MALABU that now exist or at any time existed arising from the litigation and claims referred to in this Resolution Agreement, including the award made by the House of Representatives in favour of MALABU which is the subject of Suit No. CA/A/25M/2003

   1.2   Pursuant to Clause 1.1 herein and in the exercise of its powers under the Petroleum Act, Cap P10, Laws of the Federation of Nigeria, 2004, FGN shall reallocate the interests in Block 245 jointly to SNEPCO and NAE; and shall issue the Oil Prospecting license in respect of Block 245 jointly in the names of SNEPCO and NAE. The terms of the reallocation of Block 245 to SNEPCO and NAE shall be the subject of the Reallocation Agreement, and shall include the following:

      i.   that the Oil Prospecting License to be issued to SNEPCO and NAE shall be for an aggregate period of ten (10) years commencing from the date it is issued, and

      ii.  Any OMLs which may derive therefrom shall have duration of twenty (20) years with additional renewals as allowed by law.

2   Upon the execution of this Agreement by the Parties, FGN shall deliver to SNUD, a certified true copy of the MALABU Settlement.

3   Not later than two Business Days from the issuance and delivery to SNUD of the MALABU Settlement:

   a.   SNUD shall discharge MALABU from all pending obligations and liabilities arising from any judgment/awards made pursuant to the various cases instituted and/or against MALABU by SNUD that now exist or at any time existed arising from the litigations and claims referred to in this Resolution Agreement; In particular, SNUD shall discharge MALABU from payment of all awards made by any court, administrative proceedings or tribunals, including the payment of the sum of 2.735 million US Dollars and 110,000 Naira respectively, being the costs awarded against MALABU in favor of SNUD by the ICC and affirmed by the Federal High Court in Suit No. FHC/NRJ/01/2009, SNUD versus MALABU and the Court of Appeal on 17 June 2010, and

3

b. SNUD and FGN shall withdraw and wholly discontinue all ongoing and pending suits/arbitration in respect of Block 245. Pursuant thereto, SNUD and FGN agree to file, terms of settlement reflecting the agreements herein in the form attached to this Resolution Agreement as Schedule 1 to be adopted as the judgment of the respective courts in Suit No. CA/A/25M/2003 and the Final Award in ICSID Case No. ARB/07/18. Provided that, in the event of the FGN failing to fulfill its obligations under this Resolution Agreement, such as issuing the Oil Prospecting Licence pursuant to Clause 1.2 within the term provided in the Reallocation Agreement, the ICSID Arbitration tribunal shall be entitled to take into consideration, matters contained in this Agreement, including the payment of any Signature Bonus made under the Reallocation Agreement, solely for the purpose of making appropriate award in respect of the Signature Bonus.

4   FGN hereby releases and discharges SNUD, its agents, officers and functions or any person claiming through SNUD, its agents, officers and functions, of all obligations and liabilities arising from any judgment/awards made pursuant to the various law suits instituted and or petitions whether known or unknown that now exist or at any time existed arising from the disputes, litigation and claims referred to in this Resolution Agreement; except that this release shall not be deemed to extend to any claim arising from this Resolution Agreement. In particular, such discontinuance shall serve as a discharge to SNUD from any claims whatsoever that may arise from the execution of this Resolution Agreement or any actions taken there under.

5   Each Party acknowledges that, in entering into this Resolution Agreement, it has relied on the express or implied representation and other assurances made by the other Party, its agents and representatives before the signature of this Resolution Agreement regarding the efficacy of the terms thereof.

6   This Resolution Agreement and any agreements executed by the Parties on the date of this Resolution Agreement or in pursuance thereof, supersede all and any agreement or arrangement between the Parties or any of them entered into prior to the date of this Resolution Agreement, either by letter directive, or howsoever relating to Block 245.

7   No amendments, changes or modifications to this Resolution Agreement shall be valid except if the same are in writing and signed by a duly authorised representative of each of the Parties hereto.

8   Each of the Parties shall do all such acts and execute and deliver all such documents as shall be reasonably required in order to fully perform and carry out the terms of this Resolution Agreement.

9   Each Party agrees that they and their employees, agents, agencies, subsidiaries, and attorneys will keep confidential at all times, this Resolution Agreement, the terms thereof, and the discussions or negotiations that led to this Resolution Agreement, except to the extent required by law or any competent regulatory body.

10   Definitions:

**"Affiliate"** means: a company which, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with a Party. For this purpose control means the direct or indirect ownership of in aggregate fifty percent (50%) or more of the voting capital.

4

"Business Day" shall mean a day other than Saturday, Sundays and public holidays, on which banks are open for business in Nigeria

"Clause" means a clause of this Resolution Agreement.

"Execution Date" means the date first written in this Resolution Agreement; being the date on which all Parties to this Resolution Agreement execute this Resolution Agreement.

SIGNED AND AGREED the day and year first above written.

For and on Behalf of the FEDERAL GOVERNMENT OF NIGERIA:

..............................................................................................
THE HON. ATTORNEY GENERAL AND MINISTER OF JUSTICE.

..............................................................................................
THE HON. MINISTER OF PETROLEUM RESOURCES

The COMMON SEAL of SHELL NIGERIA ULTRA-DEEP LIMITED was affixed to this Resolution Agreement and was duly delivered in the presence of:

..........................................          ..........................................
DIRECTOR                                  SECRETARY

The COMMON SEAL of SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LIMITED was affixed to this Resolution Agreement and was duly delivered in the presence of:

..........................................          ..........................................
DIRECTOR                                  SECRETARY

5

JPMC2_202012_000017

SCHEDULE 1 - PRO-FORMA TERMS OF SETTLEMENT

MATTER OF AN ARBITRATION BEFORE THE INTERNATIONAL CENTRE FOR
SETTLEMENT OF INVESTMENT DISPUTES

ICSID CASE NO. ARB/07/18

B E T W E E N

**SHELL NIGERIA ULTRA DEEP LIMITED**          - Claimant.

- and -

**THE FEDERAL REPUBLIC OF NIGERIA**          - Respondent

---

TERMS OF SETTLEMENT

---

1. The Parties have agreed to amicably resolve and settle the claims in this arbitral proceedings.

2. The terms of the settlement are as per the Resolution Agreement dated …. April 2011, duly executed by the Parties and attached hereto.

3. The Resolution Agreement constitutes a resolution of disputed claims and shall not be construed at any time for any purposes as an admission of liability by any Party.

4. The Parties hereby adopt the said Resolution Agreement as the final award of this tribunal.

5. Each Party shall bear its own cost of this arbitration.

Dated this ……..day of  …………… 2011

**For and On behalf of the Federal Republic of Nigeria**

_____

**The Honourable Attorney General of the Federation**

**For and On behalf of Shell Nigeria Ultra Deep Limited**

_____

**Director**

6

BLOCK 245 RESOLUTION AGREEMENT

THIS AGREEMENT ("FGN Resolution Agreement") is made this          day of April 2011.

Between

**THE FEDERAL GOVERNMENT OF NIGERIA** (hereinafter referred to as the **FGN**) represented by Honourable Attorney General of the Federation and Minister of Justice, the Minister of Petroleum Resources and the Minister of Finance; and

**SHELL NIGERIA ULTRA-DEEP LIMITED**, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as **SNUD**, which expression where the context so admits shall include its successors-in-title and assigns); and

**NIGERIAN NATIONAL PETROLEUM CORPORATION**, a statutory corporation established under the laws of the Federal Republic of Nigeria whose Head Office is at NNPC Towers, Central Area, Herbert Macaulay Way, P.M.B 190, Garki, Abuja, Nigeria (hereinafter referred to as "**NNPC**" which expression where the context so admits shall include its successors-in-title and assigns), and

**NIGERIAN AGIP EXPLORATION LIMITED** a company established under the laws of the Federal Republic of Nigeria whose registered office is at Churchgate Building, Plot 473 AO Constitution Avenue, Central Business Area, Abuja, (hereinafter referred to as "**NAE**", which expression where the context so admits shall include its successors-in-title and assigns), and

**SHELL NIGERIA EXPLORATION AND PRODUCTION COMPANY LIMITED**, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Freeman house, 21/22 Marina, Lagos (hereinafter referred to as **SNEPCO**, which expression where the context so admits shall include its successors-in-title and assigns);

FGN, SNUD, NNPC, SNEPCO and NAE may also be referred to herein individually as a "**Party**" or, collectively, as the "**Parties**".

Execution version



## BLOCK 245 MALABU RESOLUTION AGREEMENT

**THIS RESOLUTION AGREEMENT** is made this        day of April 2011

**Between**

**THE FEDERAL GOVERNMENT OF NIGERIA** (hereinafter referred to as the FGN) represented by Honourable Attorney General of the Federation and the Minister of Petroleum Resources; and

**MALABU OIL AND GAS LIMITED,** a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at 35 Kingsway Road, Ikoyi Lagos (hereinafter referred to as MALABU, which expression where the context so admits shall include its successors-in-title and assigns).

**FGN and MALABU** may also be referred to herein individually as a **"Party"** or, collectively, as the **"Parties".**

**WHEREAS:**

A.  On the **29th of April 1998,** the FGN granted an Oil Prospecting License (OPL 245) over oil block 245 (**"Block 245"**) to MALABU.

B.  On **30th March, 2001,** MALABU and Shell Nigeria Ultra Deep Limited (**"SNUD"**) entered into a Farm-in Agreement, and a Deed of Assignment under which MALABU assigned forty (40) percent equity interest in OPL 245 to SNUD.

C.  On the **2nd July 2001,** FGN revoked OPL 245.

D.  By a letter dated the **23rd May 2002,** the then Honourable Minister of Petroleum Resources, on behalf of FGN awarded Block 245 to SNUD on the basis of a Production Sharing Contract (**"PSC"**), following a competitive bid with another international oil company, on the invitation of the FGN.

E.  On **22nd December 2003,** Nigerian National Petroleum Corporation (**"NNPC"**) executed a PSC with SNUD, (hereinafter referred to as the **"2003 PSC"**), granting SNUD the right to exclusively operate Block 245 as contractor for a term of thirty (30) years.

F.  Subsequent to the revocation referred to in paragraph C above and the execution of the 2003 PSC, various law suits involving FGN, MALABU and SNUD, were filed to determine disputes arising from the revocation of OPL 245 by the FGN, the termination of the agreements between MALABU and SNUD referred to in paragraph B above, and the execution of the 2003 PSC in respect thereof, with SNUD.

G.  On **30th November, 2006,** the FGN executed a settlement agreement with MALABU wherein the FGN, without admission of liability for any alleged wrongful, unlawful, unjust or any like conduct, agreed to re-allocate Block 245 to MALABU in consideration of MALABU discharging and releasing the FGN from all claims and suits filed by MALABU against the FGN in connection with the revocation of MALABU's interest on 2nd July 2001.

1

H.  As a result of the execution of the settlement agreement referred to in paragraph G above, a number of dispute resolution proceedings were initiated by SNUD against FGN and/or MALABU, including the Bilateral Investment Treaty (BIT) arbitration **No. ARB/07/18** pending at the International Centre for the Settlement of Investment Disputes (**"ICSID Arbitration"**), to enforce SNUD's rights to exclusively operate Block 245 as Contactor on the basis of the 2003 PSC between NNPC and SNUD.

I.  The cases remaining between FGN, MALABU and SNUD are:

   i.   **CA/A/25M/2003** - SNUD vs. The House of Representatives and MALABU.

   ii.  **ICC No. 12136 MS (C12137/MS)** SNUD vs. MALABU. (Arbitration with resulting award in favor of SNUD delivered on 20th December 2004, and costs of US$2.735 million awarded against MALABU.)

   iii. **FHC/NRJ/01/2009** - SNUD vs. MALABU, by which the ICC Award was registered on 29 March, 2010, making it enforceable in Nigeria.)

   iv.  **ICSID Case No. ARB/07/18-** Bilateral Investment Treaty arbitration between SNUD and the FGN. (Ruling pending.)

J.  On 2nd July 2010, FGN again issued a letter to MALABU, re-allocating Block 245 to MALABU.

K.  FGN has decided to resolve its differences with MALABU amicably with respect to Block 245.

L.  MALABU is willing to settle and waive any and all claims to any interest in OPL 245 in consideration of receiving compensation from the FGN.

M.  Pursuant to paragraphs K and L. above, and with the full concurrence and agreement of MALABU, FGN is willing to reallocate Block 245 to Nigerian Agip Exploration Limited (**"NAE"**) and Shell Nigeria Exploration and Production Company Limited (**"SNEPCO"**) in accordance with the terms of a reallocation agreement of even date to be entered into between FGN, SNUD, SNEPCO, NAE and NNPC (**"Reallocation Agreement"**)

**NOW THEREFORE,** FGN and MALABU **HAVE AGREED** as follows with respect to Block 245:

1  All existing, claimed, asserted or disputed rights and privileges of MALABU, contracts, and arrangements, arising from or pursuant to Block 245 whether such rights and privileges existed, are claimed, asserted or disputed among themselves, or against the whole world (including SNUD or any party claiming through SNUD) shall at the Execution Date, be substituted by the following arrangement:

   1.1  FGN agrees to pay to MALABU, subject to Clause 2 and 3, the sum of one billion ninety two million and forty thousand Dollars (US$1,092,040,000) in full and final settlement of any and all claims, interests or rights relating to or in connection with Block 245.

   1.2  MALABU, as stipulated in Clause 4 herein, settles and waives any and all claims, interests or rights relating to or in connection with Block 245 and hereby consents to the reallocation of the interests in Block 245 by the FGN as granted in Clause 1.3 herein.

JPMC2_202012_000021

1.3   In the exercise of its powers under the Petroleum Act, Cap P10, Laws of the Federation of Nigeria, 2004, FGN shall reallocate the interests in Block 245 jointly to SNEPCO and NAE; and (ii) shall issue the Oil Prospecting license in respect of Block 245 jointly in the names of SNEPCO and NAE

2    Within eight (8) Business Days from the execution of this Agreement by the Parties herein:

i)    MALABU, shall execute terms of settlement with SNUD, in the form attached to this Resolution Agreement as Schedule 1 to be attached to and filed with a Notice of Discontinuance of Suit No. CA/A/25M/2003 at the Court of Appeal..

ii)   Upon the filing of the Notice of Discontinuance in Suit No. CA/A25M/2003 at the Court of Appeal by SNUD, MALABU shall deliver a certified true copy thereof with the executed terms of settlement referred to in Clause 2 (i) above, to FGN.

iii)  No later than five (5) Business Days following the latter of (i) the reallocation and the issuance of the Oil Prospecting Licence 245 to SNEPCO and NAE in terms of Clause 1.3, and (ii) receipt from MALABU of the certified true copy of the Notice of Discontinuance  of of Suit No. .CA/A25M/2003 with the terms of settlement referred to in Clause 2 (i) above attached thereto at the Court of Appeal pursuant to Clause 2 (ii) above, FGN shall pay the amount specified in Clause 1.1 to MALABU.

3    FGN shall procure the release of MALABU by SNUD, from all pending obligations and liabilities arising from any judgment/awards made pursuant to the various cases instituted and/or awards against MALABU by SNUD that now exists or at any time existed arising from the litigations and claims referred to in this Resolution Agreement. In particular, FGN shall procure the discharge of MALABU by SNUD in accordance with the terms of the SNUD Resolution Agreement, of all awards made by any court, administrative proceedings or tribunals, including the payment of the sum of 2.735 million US Dollars and 110,000 Naira respectively, being the costs awarded against MALABU in favor of SNUD by the ICC and affirmed by the Federal High Court in Suit No. FHC/NRI/01/2009. SNUD versus MALABU and the Court of Appeal on 17 June 2010.

4    MALABU hereby releases and discharges FGN,  its agents, officers and functions or any person claiming through FGN, its agents, officers and functions, of all obligations and liabilities arising from any judgment/awards made pursuant to the various law suits instituted and or petitions whether known or unknown that now exist or at any time existed arising from the disputes, litigation and claims referred to in this Resolution Agreement, including the award made by the House of Representatives in favour of MALABU which is the subject of Suit No. CA/A/25M/2003; except that this release shall not be deemed to extend to any claim arising from this Resolution Agreement. In particular, such discontinuance shall serve as a discharge to FGN from any claims whatsoever that may arise from the execution of this Resolution Agreement or any actions taken there under.

5.   Each Party acknowledges that, in entering into this Resolution Agreement, it has relied on the express or implied representation and other assurances made by the other Party, its agents and representatives before the signature of this Resolution Agreement regarding the efficacy of the terms thereof.

3

JPMC2_202012_000022

6. This Resolution Agreement and any agreements executed by the Parties on the date of this Resolution Agreement or in pursuance thereof, supersede all and any agreement or arrangement between the Parties or any of them entered into prior to the date of this Resolution Agreement, either by letter directive, or howsoever relating to Block 245, with the exception of the SNUD Resolution Agreement.

7. No amendments, changes or modifications to this Resolution Agreement shall be valid except if the same are in writing and signed by a duly authorised representative of each of the Parties hereto.

8. Each of the Parties shall do all such acts and execute and deliver all such documents as shall be reasonably required in order to fully perform and carry out the terms of this Resolution Agreement.

9. Each Party agrees that they and their employees, agents, agencies, subsidiaries, and attorneys will keep confidential at all times, this Agreement, the terms thereof, and the discussions or negotiations that led to the Agreement, except to the extent required by law or any competent regulatory body.

10 Definitions:

**"Affiliate"** means: a company which, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with a Party. For this purpose control means the direct or indirect ownership of in aggregate fifty percent (50%) or more of the voting capital.

**"Business Day"** shall mean a day other than Saturday, Sundays and public holidays, on which banks are open for business in Nigeria

**"Clause"** means a clause of this Resolution Agreement.

**"Execution Date"** means the date first written in this Resolution Agreement; being the date on which all Parties to this Resolution Agreement execute this Resolution Agreement.

**SIGNED AND AGREED** the day and year first above written.

For and on Behalf of the **FEDERAL GOVERNMENT OF NIGERIA**

..............................................................

**THE HON. ATTORNEY GENERAL AND MINISTER OF JUSTICE.**

..............................................................

**THE HON. MINISTER OF PETROLEUM RESOURCES**

4

The **COMMON SEAL of MALABU OIL AND GAS LIMITED** was affixed to this Resolution
Agreement and was duly delivered in the presence of:

...................................................          ...................................................

*DIRECTOR*                                          *COMPANY SECRETARY*

5

| From: | Lyall, Ian <Ian.Lyall@jpmorgan.com> |
|---|---|
| Sent: | Thursday, June 23, 2011 11:19 AM |
| To: | Lloyd, Simon X <simon.lloyd@jpmorgan.com> |
| Subject: | Information |

We have been discussing for the last few days the avenues that we should explore with regard to the blocked monies under the depository agreement. AS you know they were returned to us by the receiving Swiss bank for Compliance reasons, and a SAR was subsequently filed with SOCA. Whilst we remain suspicious that these funds could be the proceeeds of corruption by public officials, any request by FGN for their payment elsewhere would be subject to a consent request to SOCA that can take up to seven working days. We will be speakig to SOCA in the nest day or so to try to make the period taken by SOCA as short as possible. However, we need to be comfortable that any new instruction can be properly verified, and even then, JPMorgan needs to be comfortable that it is taking the appropriate steps in following these instructions.

We have received an enquiry as to what we would need to receive to carry out a new payment order to what we believe to be the same beneficiary at another bank. We have discussed this internally and feel that.the following would be appropriate in the circumstances:

### Privilege - LPP

The authorised signatories to be I the same official capacity as the previous signatories.

Face to face meetings with the individuals where their status and identity was confirmed by copy of their passports and then due diligence carried out on these individuals. It is possible that we might be able to get confirmation from the Attorney General or a Nigerian Court that it was in oder to act on the new instructions and confirm the bona fides of the new officers.

Discussions with the new Arrorney General on the transaction and given the size and sensitivity of the payment, perhaps the President himself.

The call back procedures as defined, to the telephone numbers given but with the individuals to be called known by JPMorgan.

The question then arises, once we have carried all this due diligence and SOCA has given consent, it is proper for JPMorgan to make the consent given the issues surrounding it? What solutions are available to us in those circumstances:

We could refuse to pay. FGN might then choose to sue us for recovery of the funds which would mean that the case would go to court for direction. This is an adversarial approach, and would be not good for either party but we would have a court direction.

We could go to the courts in Nigeria, UK or the USA to seek direction, but as yet there are no competing claims to the cash. FGN wish to pay the beneficiary and the cash is sitting in the FGN account. At the moment it is not clear what the basis of such an application would be.

We could state that we are only prepared to make the payment to the CBN account (account FGN) at JPMorgan Chase Bank in NY, but given our concerns, that only transfers the probelem to the US jurisdiction. | Privilege - LLP | which also has significant client relationship issues. Some of the solutions listed below have already been incorporated in the alternatives above.

# Privilege - LLP

We would like to explore the legal position with these alternatives and also review the legal risks if we went ahead with the paayment as requested in the given circumstances. Clearly, it would not seem at odds to make a payment from the UK, which JPMorgan in the US would reject based on the same fact pattern.

CONFIDENTIAL

**Traduzione mail di Ian Lyall a Simon Lloyd 23.6.2011 – oggetto "Informazioni"**

(Doc JPMC2_202012_000025)

Nel corso degli ultimi giorni abbiamo discusso sulle strade che dovremmo esplorare con riferimento al denaro dell'accordo di deposito che è stato bloccato. Come sai, questi fondi ci sono stati ritrasferiti dalla banca svizzera ricevente per ragioni di compliance, e abbiamo conseguentemente inviato una segnalazione di operazione sospetta (SAR) alla SOCA. Mentre rimaniamo sospettosi che tali fondi possano essere profitto di corruzione di pubblici ufficiali, qualsiasi richiesta proveniente da FGN affinché vengano trasferiti altrove sarebbe soggetta ad una richiesta di consenso a SOCA che potrebbe richiedere fino a sette giorni lavorativi. Parleremo con SOCA nel giro di qualche giorno per cercare di ridurre il periodo richiesto da SOCA il più possibile. In ogni caso, abbiamo bisogno di essere tranquilli sul fatto che ogni nuova istruzione possa essere appropriatamente verificata, e, anche in questo caso, JP Morgan ha bisogno di essere tranquilla che sta effettuando gli appropriati passaggi nel seguire queste istruzioni.

Abbiamo ricevuto un quesito su cosa necessiteremmo ricevere al fine di disporre un nuovo ordine di pagamento a quello che dovessimo ritenere essere il medesimo beneficiario presso un'altra banca. Abbiamo discusso questo punto internamente e crediamo che nelle attuali circostanze sarebbe appropriato quanto segue:

| PRIVILEGE LPP |
| --- |

I firmatari autorizzati dovranno avere la stessa qualifica ufficiali dei precedenti firmatari.

Incontri faccia a faccia con gli individui il cui status e identità siano confermati attraverso la copia del loro passaporto e successivamente venga fatta una due diligence su questi individui. È possibile che potremmo avere conferma dall'Attorney General o da una corte nigeriana che agire in base alle nuove istruzioni sia in ordine e confermino la buona fede dei nuovi ufficiali.

Discussioni con il nuovo Attorney General sulla transazione e, considerata la dimensione e la rilevanza del pagamento, forse addirittura con il Presidente

Usare le procedure già definite per richiamare l'interlocutore, ai numeri di telefono che ci sono stati forniti,  ma con l'aggiunta che gli individui da chiamare siano conosciuti da JP Morgan

La domanda che poi emerge, una volta che abbiamo effettuato tutte queste due diligence e SOCA ha dato il consenso, è corretto per JP Morgan dare l'autorizzazione considerati i problemi che circondano la questione? Quali soluzioni sono ipotizzabili in queste circostanze:

Possiamo rifiutare di pagare. FGN potrebbe quindi scegliere di citarci per recuperare i fondi il che significherebbe che il caso approderebbe in Corte. Questo è un approccio di contrapposizione, e non sarebbe buono per nessuna delle due parti ma potremmo avere una decisione giurisdizionale.

Potremmo andare davanti al giudice in Nigeria, UK o USA per chiedere un ordine, ma per ora non ci sono pretese contrapposte sulla somma. FGN vuole pagare il beneficiario e la somma è ferma nel conto di FGN. Al momento, non è chiaro quale sarebbe la base per una richiesta del genere ad una Corte.

Potremmo affermare che siamo solo disposti a fare il pagamento al conto CBN[1] (conto di FGN) presso JP Morgan Chase Bank a NY, ma considerate le nostre preoccupazioni, questo sposterebbe solo il problema alla giurisdizione americana - PRIVILEGE LLP – che ha anche questioni significative rispetto alla relazione con il cliente. Alcune delle soluzioni indicate sotto sono già state incorporate nelle soluzioni sopra indicate.

| PRIVILEGE LLP |
| --- |

Vorremmo approfondire l'aspetto legale rispetto a queste alternative e anche ricontrollare i rischi legali se andassimo avanti con il pagamento come richiesto, nelle circostanze date.

Chiaramente, non[2] sembrerebbe contraddittorio fare un pagamento dall'UK, che JP Morgan negli US rigetterebbe sulla base della medesima sequenza fattuale.

---

[1] CBN – Central Bank of Nigeria
[2] "non" potrebbe essere un refuso

# ATTACHMENT 2



20, Mojidi Street,
Off Toyin Street, Ikeja, Lagos.
+ 234-803 3044 617, 803 3468114
info@hedang.org, www.hedang.org

RC:16,485

**27th April, 2021**

**Kanu G Agabi, CON, SAN**
**Kanu G. Agabi & Associates**
**Trinity House, Plot 943,**
**Cadestral Zone BO6,**
**Mabushi, Abuja,**
**Nigeria**

**Dear Mr. Agabi SAN,**

**Defamation of Human and Environmental Development Agenda (HEDA
Resource Centre) and Mr. Olanrewaju Suraju**

On February 5, 2021, your law firm (acting on behalf of a Mr. Mohammed Bello Adoke
SAN ['Adoke']) sent a Petition ['the Petition'] to the Inspector General of Police,
entitled "Forgery of Documents for Purposes of Unlawful Interference with the Course
of Justice". The Petition was widely reported by media house and advertised on
Thecable and Premiumtimes online newspapers, reportedly on the basis of it having
been distributed and advertised by your law firm.

The Petition demands an investigation into what was alleged to be "various acts of
forgery" by "the parties responsible for the petition, investigations and
commencement of the criminal trial at the court of Milan against the
individuals/entities connected with the OPL 245 settlement agreement". The Petition
also states "the persons or organisations behind these forgeries are the ones that
authored the petition to the Economic and Financial Crimes Commission (EFCC),
demanding the investigation of the OPL 245 Resolution Agreement".

The Petition specifically references an email that was accepted as evidence in
Milan.

The Petition, as stated above, was posted on the Internet and was widely reported by
several newspapers. It remains posted at https://media.premiumtimesng.com/wp-
content/files/2021/02/FORGERY-OF-DOCUMENTS.pdf.

The Petition did not mention names but states that the accused parties can be
discovered "with a little diligence". HEDA's role, since 2013, as one of the parties
responsible for the EFCC petition leading to the investigations and prosecution in
Nigeria is widely known amongst our peers. Your client, Mr. Bello Adoke further
appeared before the Inspector General of Police's Monitoring Unit to adopt this
petition and specifically mentioned the names of Human and Environmental
Development Agenda (HEDA) and its Chairman, Olanrewaju Suraju as a suspect
referenced in your letter.

The statements made in the Petition about us are not only entirely untrue but highly
defamatory and misleading to the law enforcement agency. HEDA was accused by

your client of criminal acts, namely forgery and falsification of evidence – accusations that are highly damaging to the reputation of HEDA as a respected anti-corruption group in Nigeria and abroad.

HEDA has authored over 500 complaints to Economic and Financial Crimes Commission (EFCC), Independent Corrupt Practices and other related Offences Commission (ICPC), Code of Conduct Bureau (CCB) and other international law enforcement agencies on cases similar to that involving your clients, resulting in investigations, prosecution and convictions of those affected. The OPL245 is one of these several complaints and never was the organization accused of bias or misleading the law enforcement agencies in any of these complaints.

The facts are as follows:

1. The existence of the email in question came to light after it was disclosed by JP Morgan Chase to the Federal Republic of Nigeria ['FRN'] as a result of proceedings in the High Court in London where the FRN is currently suing the bank for damages relating to its handling of funds arising from Shell and Eni's acquisition in 2011 of the OPL 245 oil field in Nigeria (case number: CL-2017-000730). Mr. Adoke was the Attorney General at the time of the deal, a key negotiator and signatory to the Resolution Agreement between FGN and Malabu.

2. In its claim, the FRN stated that an email had been sent by a Mohammed Bello Adoke on 21 June 2011 to a Bayo Osolake, an employee of JP Morgan Chase bank, from the email address "agroupproperties@yahoo.com".  Copies of the Resolution Agreements for the OPL 245 deal were attached to the email.

3. The FRN further stated in court documents that the email address was associated with "the A Group of Nigerian companies controlled by Mr. Abubakar Aliyu". A Group Construction, which is part of the group, subsequently received some of the OPL 245 funds which were transferred by JP Morgan Chase bank to a company named Malabu Oil & Gas.

4. Independent investigation has revealed the email address agroupproperties@yahoo.com is a pre existing email address and was owned and registered with Corporate Affairs Commission as the official email address of a Company, School Aid App Ltd, in which Mr. Aliyu Abubakar is a shareholder and Director. With this established fact, it is certain a genuine petition seeking investigation would have conducted this basic check and appropriately direct suspicion to owners of the email. We are not surprised at the otherwise direction of the petition on behalf of your client.

5. Your Client, Mr. Bello Mohammed Adoke has a long standing relationship with Mr. Abubakar Aliyu, the registered owner of the email address under investigation. In his autobiography titled "Burden of Service", Mr. Adoke admitted this much when he said, ……..*Alhaji Aliyu Abubakar, a builder and a developer whom I had been acquainted with for a long time, had earlier approached me with an offer to sell me a house for N500 million."* Both are being prosecuted for money laundering for money laundering and other charges in relation to this deal.

6. Having become aware of the email, which we believed to be relevant to the prosecution in Milan of Royal Dutch Shell, Eni Spa and others, our international partners, acting in the public interest, informed the Milan Prosecutor of the FRN's statements to the High Court in London.

7. The Milan Prosecutor issued a European Investigation Order (Ref:54772/13) to the UK, seeking the email from JP Morgan. The UK authorities complied with the request and transmitted the email to Milan Prosecutor, which was subsequently accepted as evidence by the Milan Tribunal. Your Client, prior to his appointment as, Attorney General of the Federation, was reported as lawyer to Mr. Dan Etete, the ultimate beneficiary of the proceeds of the 'forged' email.

As the Petition states, the email may have been sent on Adoke's behalf. It is also possible your client sent it with the deliberate omission of the suffix, SAN, to serve as alibi in situation like this. However, we categorically deny that we forged the email. The accusation, for which the Petition has failed to provide a shred of supporting evidence, is libelous and we therefore seek an immediate remedy.

We note that neither you nor your client made any attempt to seek our comments prior to the publication of your Complaint.

We now expect Mr Adoke SAN to issue a full retraction of the defamatory statements made against HEDA and its Chairman at the earliest possible date. If within 14 days of the receipt of the letter, no retraction has been made, we will initiate legal action against Mr. Adoke SAN and his agents.

We reserve our right to bring proceedings in Nigeria or any other jurisdiction where damage has been caused. We are currently assessing the extent of the damage to our reputation caused by internet publication of the Petition in Nigeria. Given the wide readership of Nigerian newspapers which reported the Petition online across the world, we believe that many readers will have read the defamations.

Our actions towards remedy of the damages will depend on the speed and nature of your response.


Your Sincerely



**Olanrewaju Suraju**
Chairman, HEDA Resource Centre

# ATTACHMENT 3

IN THE FEDERAL HIGH COURT OF NIGERIA
IN THE ABUJA JUDICIAL DIVISION
HOLDEN AT ABUJA

FHC|ABJ|CR|870|2021
CHARGE NO:

BETWEEN

FEDERAL REPUBLIC OF NIGERIA                    COMPLAINANT
AND
OLANREWAJU SURAJU                              DEFENDANT

## CHARGE

### COUNT ONE

That you **OLANREWAJU SURAJU**, Male, of 20, Mojidi Street, Ikeja Lagos sometime in 2018, within the jurisdiction of this Honourable Court, did intentionally circulate an audio telephone interview alleged to have occurred between one Ms. Carlamaria Rumor a reporter with RIA Reporter in Italy and Mr. Mohammed Bello Adoke SAN via your Twitter handle @HEDAagenda which you knew to be false for the purpose of causing insult to **Mr. Mohammed Bello Adoke SAN** and you thereby committed an offence contrary to **Section 24 of the Cybercrimes (Prohibition, Prevention, ETC) Act, 2015** and punishable under the same Section of the Act.

### COUNT TWO

That you **OLANREWAJU SURAJU**, Male, of 20, Mojidi Street, Ikeja Lagos sometime in 2018, within the jurisdiction of this Honourable Court, did intentionally circulate an audio telephone interview alleged to have occurred between one Ms Carlamaria Rumor a reporter with RIA Reporter in Italy and **Mr. Mohammed Bello Adoke SAN** on your Facebook page with the handle @HEDAResourcecentre which you knew to be false for the purpose of causing insult to **Mr. Mohammed Bello Adoke SAN** and you thereby committed an offence contrary to **Section 24 of the Cybercrimes (Prohibition, Prevention, ETC) Act, 2015** and punishable under the same Section of the Act.

## COUNT THREE

That you **OLANREWAJU SURAJU**, Male, of 20, Mojidi Street, Ikeja Lagos sometime in 2018, within the jurisdiction of this Honourable Court, did intentionally circulate an email dated **21st June, 2011** alleged to have been sent with the email address agroupproperties@yahoo.com owned by A Group Properties and received by a certain Osoluke Bayo. O with the email address bayo.o.osoluke@jpmorgan which you knew to be false via your Twitter handle @HEDAagenda for the purpose of causing insult to **Mr Mohammed Bello Adoke SAN** and you thereby committed an offence contrary to **Section 24 of the Cybercrimes (Prohibition, Prevention, ETC) Act, 2015** and punishable under the same Section of the Act.

## COUNT FOUR

That you **OLANREWAJU SURAJU**, Male, of 20, Mojidi Street, Ikeja Lagos sometime in 2018, within the jurisdiction of this Honourable Court, did intentionally circulate an email dated **21st June, 2011** alleged to have been sent with the email address agroupproperties@yahoo.com owned by A Group Properties and received by a certain Osoluke Bayo. O with the email address bayo.o.osoluke@jpmorgan which you knew to be false via your Facebook handle @HEDAResourcecentre for the purpose of causing insult to **Mr. Mohammed Bello Adoke SAN** and you thereby committed an offence contrary to **Section 24 of the Cybercrimes (Prohibition, Prevention, ETC) Act, 2015** and punishable under the same Section of the Act.

Dated this ...... 8TH ...... Day of October, 2021

**A.O SHAIBU**
**DEPUTY DIRECTOR**
**A.K ALILU** ✓
**CHIEF STATE COUNSEL**
**Y.A COLE**
ASSISTANT CHIEF STATE COUNSEL
Department of Public Prosecutions of the Federation
08077883488
For: The Honourable Attorney-General of the Federation and Minister of Justice



FEDERAL HIGH COURT OF NIGERIA
ABUJA
OFFICIAL
SIGN:......
DATE:...... 8 | 10 | 209

A

**FOR SERVICE ON:**

The Defendants

 

IN THE FEDERAL HIGH COURT OF NIGERIA
IN THE ABUJA JUDICIAL DIVISION
HOLDEN AT ABUJA

CHARGE NO:

BETWEEN

FEDERAL REPUBLIC OF NIGERIA          COMPLAINANT
AND
OLANREWAJU SURAJU                    DEFENDANT

### AFFIDAVIT OF COMPLETION OF INVESTIGATION

I, Noma Ganau Wondo, Male, Muslim, Adult of Department of Public Prosecutions of the Federation, Federal Ministry of Justice, Maitama, Abuja do solemnly make Oath and state as follows:

1. That I am a litigation Clerk in the Office of the Director Public Department of the Federation, Federal Ministry of Justice, Abuja;
2. That by virtue of my position, I am conversant with the facts of this case;
3. That I have the authority of my employer to swear to this affidavit;
4. That A O Shaibu the lead Prosecuting Counsel in this case informed me in his office in the Federal Ministry of Justice Abuja on Friday 8th September, 2021 at about 9:00am and I verily believe him as to the following facts;
   a. That the Defendant in this case was arrested and investigated for circulating information which he knew to be false on his social media handles.
   b. That investigation into the matter has been concluded;
   c. That in his opinion, the investigation has so far revealed a prima facie case against the Defendant;
5. That I depose to this affidavit in good faith believing same to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

DEPONENT

Sworn to at the Federal High Court Registry, Abuja.

THIS ......8th......DAY OF ...October......2021

BEFORE ME

COMMISSIONER FOR OATHS
A B U J A

FEDERAL HIGH COURT OF NIGERIA
ABUJA
OFFICIAL
SIGN:...............
DATE:....8|10|2021

ꜷ

IN THE FEDERAL HIGH COURT OF NIGERIA
IN THE ABUJA JUDICIAL DIVISION
HOLDEN AT ABUJA

CHARGE NO:

BETWEEN

FEDERAL REPUBLIC OF NIGERIA                    COMPLAINANT
AND
OLANREWAJU SURAJU                              DEFENDANT

## LIST OF WITNESSES

**TAKE NOTICE** that at the trial of the above named defendants, the prosecution intends to rely on the testimony of the following witnesses:

1. MR Mohammed Bello Adoke, SAN: He is the nominal complainant, he will testify on the complaint he made to the Police
2. Abubakar Aliyu: He will tell the court what he knows about his purported email that was sent from his account.
3. Ajene Isegbe: he will testify on the investigation done by him and his team.
4. Any other witness(es) as the prosecution may deem fit in the circumstances.

Dated this ..............8th.................. Day of October, 2021

A.O SHAIBU
DEPUTY DIRECTOR
A.K ALILU
CHIEF STATE COUNSEL
Y.A COLE
ASSISTANT CHIEF STATE COUNSEL
Department of Public Prosecutions of the Federation
08077883488
For: The Honourable Attorney-General of the Federation and Minister of Justice.

FEDERAL HIGH COURT OF NIGERIA
ABUJA
OFFICIAL
SIGN:..................
DATE: 8/10/2021

IN THE FEDERAL HIGH COURT OF NIGERIA
IN THE ABUJA JUDICIAL DIVISION
HOLDEN AT ABUJA

CHARGE NO:

BETWEEN

FEDERAL REPUBLIC OF NIGERIA                    COMPLAINANT
AND
OLANREWAJU SURAJU                              DEFENDANT

## LIST OF EXHIBITS

1. The Petition submitted to the Police on behalf of the nominal complaint.

2. Defendant's Statements.

3. Copy of the email purportedly sent by Mr. Mohammed Bello Adoke SAN through Abubakar Aliyu.

4. The audio telephone interview alleged to have occurred between one Ms. Carlamaria Rumor a reporter with RIA reporter in Italy and Mr. Mohammed Bello Adoke SAN

5. Any other document the Prosecution deems necessary to rely on.

Dated this ..................... Day of October, 2021

A.O SHAIBU
DEPUTY DIRECTOR
A.K ALILU
CHIEF STATE COUNSEL
Y.A COLE
ASSISTANT CHIEF STATE COUNSEL
Department of Public Prosecutions of the Federation
For: The Honourable Attorney-General of the Federation and Minister of Justice.
08077883488

FEDERAL HIGH COURT OF NIGERIA
ABUJA
OFFICIAL
SIGN:
DATE: 8|10|2021

IN THE FEDERAL HIGH COURT OF NIGERIA
IN THE ABUJA JUDICIAL DIVISION
HOLDEN AT ABUJA

CHARGE NO:

BETWEEN

FEDERAL REPUBLIC OF NIGERIA                    COMPLAINANT
AND
OLANREWAJU SURAJU                              DEFENDANT

## SUMMARY OF THE PROSECUTION'S CASE AGAINST THE DEFENDANT

This is a case of cyberstalking against Mr Mohammed Bello Adoke, SAN by the Defendant. The Defendant circulated on his social media handles email and audio interview which he knew to be false after same was rejected in evidence in a criminal court in Italy. That the aim of the Defendant is to insult and dent the image of Mr Mohammed Bello Adoke, SAN

The defendant is charged under the **Section 24 of the Cybercrimes (Prohibition, Prevention, ETC) Act, 2015** for sharing intentionally sharing information which he knew to be false.

Dated ............. Day of ...................... 2021

A.O SHAIBU
DEPUTY DIRECTOR
A.K ALILU
CHIEF STATE COUNSEL
Y.A COLE
ASSISTANT CHIEF STATE COUNSEL
Department of Public Prosecutions of the Federation
For: The Honourable Attorney-General of the Federation and Minister of Justice.
08077883488

FEDERAL HIGH COURT OF NIGERIA
ABUJA
OFFICIAL
SIGN:.................
DATE:.................

FOR SERVICE ON:
The Defendant